IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 8:04CR460 |
| vs. | ) | |
| | ) | REPORT AND |
| ADAN RUBIO, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This matter is before the court on defendant's MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS (#12). Hearing was held on January 31, 2005. The transcript of the hearing (#17) was filed February 8, 2005 and the parties were given leave to file post-hearing briefs (#20 & #21). The final brief was filed on March 4, 2005, at which time the motion was deemed submitted.

The defendant, Adan Rubio, moves the court for an order suppressing physical evidence and statements obtained prior to the defendant being read his *Miranda* rights.[1] He contends that no probable cause existed to stop and detain the defendant, and that the defendant's consent to search his residence was not voluntarily given, all in violation of the defendant's rights under the Fourth Amendment to the United States Constitution.

### FACTUAL BACKGROUND

Pamela Heidzig testified she is an eleven-year veteran of the Omaha Police Department, currently assigned to the narcotics unit. On September 28, 2004 she was

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

involved in an operation that led to the arrest of Carlos Villalobos (7:16-20). The arrest occurred after Villalobos was set up by another person to deliver a quarter-pound of methamphetamine in Council Bluffs, Iowa (7:22-8:1). After his arrest Villalobos told officers about the person for whom he was making the delivery. Villalobos said he knew this person as "V," and provided information about what the person drove and where he lived (8:14-21). Villalobos also told the officers the drugs he was caught with had come from "V." (9:2-5).

Heidzig testified she asked Villalobos if police could search his residence at 2218 Poppleton and Villalobos agreed they could (9:11-16). On the way to 2218 Poppleton, Villalobos took the officers past another location, 1718 South 17th Street, which he identified as a place "V" stayed (9:21-10:1).

According to Heidzig, Villalobos agreed to make a phone call and order another quarter-pound which "V" would deliver (10:12-14). At 10:46 P.M., Villalobos made a phone call which Heidzig tape recorded (10:17-23). As a result of the call, it was determined that "V" would deliver a quarter-pound to Villalobos at Villalobos' residence (11:5-8). As the officers did not want the delivery to occur at that location, they had Villalobos call again and change the location. A second call was made by Villalobos at 11:04. During the second call, "V" agreed to deliver the drugs to the Kwik Shop at 24th and Poppleton (11:23-12:8).

Heidzig testified that she and other officers set up across the street from the Kwik Shop (12:9-15) and Officer Mark Lang positioned himself near a house at 1718 South 17th Street, which was believed used by "V" (13:7-15).

Heidzig testified Lang reported that a car had driven up to the South 17th Street address and a person had gotten out and gone inside (13:17-22). Lang described the person as wearing a white cap and a black mid-length leather coat and the vehicle as a black Nissan-type vehicle (13:23-14:4). The person then exited the house, returned to the vehicle, and drove away (14:5-9).

Heidzig testified that two minutes later (16:1-4) she saw a vehicle fitting Lang's description pull into the Kwik Shop (15:6-10). She observed a person exit the vehicle and enter the Kwik Shop. This individual also fit Lang's description in that he was wearing a longer leather coat and a white cap. As the person walked into the Kwik Shop he was talking on a cell phone (15:15-18).

Heidzig testified that after the person entered the Kwik Shop, she observed officers from the Gang Unit arrive, wearing raid gear, and enter the Kwik Shop (16:17-22). At that time she was talking with Villalobos, who also saw the person arrive and enter the Kwik Shop. Villalobos identified the person as the person who earlier that day had delivered methamphetamine to him, the same methamphetamine he was caught with (17:13-18). Heidzig admitted the vehicle that the defendant drove to the Kwik Shop was not a Nissan, but a dark blue Honda (19:14-18).

-3-

Heidzig testified that while she and Villalobos were at the Kwik Shop, Villalobos received a call on his cell phone. When Villalobos answered the call he spoke in Spanish, but later told Heidzig the man on the phone wanted to know what was going on because he was talking to someone and was disconnected (20:13-21:10).

On cross-examination Heidzig testified that when he saw the person at the Kwik Shop, Villalobos was absolutely sure of his identification that the defendant was the same person from earlier in the day (22:23-23:8).

Mark Langan testified that he was employed by the Omaha Police Department for 26 years; however, he is currently the Vice President of Field Operations at the Nebraska Humane Society. On September 28, 2004 while working as a sergeant in narcotics for the Omaha Police Department, he was in charge of officers helping Iowa police after the arrest of Carlos Villalobos. Langan became aware Villalobos was willing to cooperate and provide information about his supplier of methamphetamine (29:2-7). Langan also learned that Villalobos had identified 1718 South 17th Street as an address where a party known as "V" resided. Villalobos identified "V" as his methamphetamine supplier and told officers "V" utilized runners to drop methamphetamine and that Villalobos was one of those runners (29:11-23). Langan was also informed that the drugs Villalobos was caught with had been delivered to him by a runner after arrangements had been made over the phone with "V" (30:3-6).

Langan testified he assembled a team and arranged a phone call from Villalobos to "V" which resulted in an arrangement that either "V" or one of his runners would bring methamphetamine to a location where the police planned an arrest (30:10-14). Langan also ordered the surveillance by Lang at 1718 South 17th Street (30:14-16). Langan was also told that two telephone calls were made–one at 10:46 p.m. and a second call at 11:04 p.m. As a result of the second phone call, drugs would be delivered to the Kwik Shop at 24th and Poppleton (31:10-15). Langan positioned Heidzig in a police vehicle, also occupied by Villalobos, on the east side of 24th Street just north of Poppleton so Villalobos would have an opportunity to identify the suspect when he arrived (31:16-32:1).

Langan testified he heard Officer Lang advise officers that a black Nissan-type vehicle arrived at 1718 South 17th Street driven by a Hispanic male wearing a white ball cap and a black three-quarter length leather coat, that the vehicle then left the address, and that officers at the Kwik Shop should be on the lookout for the vehicle (32:11-19). Within a minute Langan observed a similar vehicle, a blue Honda with in-transits, moving westbound on Poppleton with one occupant (32:23-33:4). The vehicle entered the Kwik Shop parking lot.

Langan dispatched two officers from the gang unit to the parking lot to secure the driver. Langan testified that Officers Anderson and Dufek entered the Kwik Shop and secured the suspect, later identified as the defendant, Adan Rubio, and walked him outside (34:17-20). Heidzig advised Langan by police radio that Villalobos, who was with her, had identified the person as the same person who had delivered a quarter-pound of

methamphetamine to him earlier in the evening (34:25-35:3). Langan observed Dufek handcuff and pat-down the defendant, removing a large ball of methamphetamine from the defendant's left inner coat pocket (36:7-10). The defendant was asked his name. Langan did not recall the name that was given, but it was not Adan Rubio (37:5-9). The defendant told Langan that his address was 1718 South 17th Street (37:14-17). The defendant spoke in English, which was somewhat broken but very understandable (37:18-23).

Langan testified he asked the defendant if he would consent to a search of 1718 South 17th Street. The defendant stated "yes," volunteering that the key to the house was on the ring with his car keys (38:5-14). Langan testified he did not threaten the defendant or promise anything (39:1-5). He observed the defendant did not appear under the influence of alcohol or drugs (39:5-9).

Langan testified he assigned a team of officers to 1718 South 17th Street to conduct a search and that he had no further conversations with the defendant at the Kwik Shop; however, he did seize two cell phones from the defendant and later reviewed them for numbers called. The review disclosed that at 11:19 a call was made from one of the cell phones to the same cell phone number that Villalobos had called to contact "V" (40:15-25) and that Villalobos' cell phone showed a contact from "V's" cell phone following "V's" arrival in the parking lot at the Kwik Shop (41:1-6).

On cross examination Langan testified that while he was dressed in plain clothes, the two officers who approached the defendant were dressed in riot gear (42:19-21) and that the

-6-

defendant gave his address to Langan before he received his *Miranda* rights, but after he was cuffed and secured (43:3-7).

On redirect examination Langan testified that when he asked the defendant for his name and address and permission to search, his gun was holstered and at no time did any officer display a weapon (43:12-20).

On recross examination, Langan testified that officers were not wearing riot gear, but raid gear, comprised of bulletproof vests with "Omaha Police" printed on the front and back, cargo pants, and high, laced boots (43:25-44:11).

Adan Rubio testified he remembers that on September 28, 2004 he was taken into custody at the Kwik Shop at 24th and Poppleton (46:11-13). He denied, however, that he told Langan he lived at "1718 Center [sic] Street" (47:3-5), but recalled Langan did ask him for consent to search the address (47:10-14). The defendant stated he did not understand Langan when he asked for consent, that he didn't understand many things, and was just telling officers he did not understand (47:15-19). He stated he does not speak English too well and does not believe that he understood too well (47:20-24). The defendant denied that he showed Langan a key to the residence, stating the officers took the car keys (48:9-17). The defendant denied he gave permission to use the keys stating he told the officers he did not live there so he could not give permission for them to enter (49:3-5). He could not recall anything he said that night that would lead someone to believe they could search the

residence, stating that he limited himself to saying nothing, and told officers he wanted an attorney present before making any statement (49:16-21).

On cross examination the defendant testified that Langan never asked him his name, but looked through his wallet and found identification in the name of Enrique Ruiz (50:7-18). The defendant admitted that prior to entering the Kwik Shop, he did stop at 1718 South 17th Street and go into the house. He also admitted he had a key to the house (52:1-8). The defendant admitted that officers did ask him where he lived and he responded, "I told them that because I had only gotten there a week before, that I was staying at an apartment at 125th Street or something, but that I was not able to give them the full address." (52:15-18). He admitted Langan asked him about 1718 South 17th Street and that Langan told him he was seen coming out of the house and not to lie about it (52:19-53:1). The defendant admitted that he had been in the United States for about 10 years and speaks some English, but understands more English than he speaks. He said he told Langan he did not live at the address and that he could not give authorization to search (53:2-9).

The defendant further testified he was asked by Langan which key fit the house, but that he told Langan he did not know which one was the house key as the house was open and he had not used a key to enter (54:13-55:1). The government's Exhibit 1, an Omaha Police Department RECEIPT AND INVENTORY was received in evidence, apparently to contest the credibility of the defendant's testimony that the house had been left open. The document describes the items seized from the residence at 1718 South 17th Street, Omaha, Nebraska

on September 28, 2004.  Apparently, it is the government's position that it is "incredible" that the house had been left unlocked in light of the drugs, handguns and other items which were found inside.  (62:5-12).

## LEGAL ANALYSIS

Defendant asks for the suppression of all physical evidence and statements because the police did not have probable cause to detain and arrest him without a warrant, he was not given his *Miranda* rights, and he did not voluntarily consent to the search of the residence at 1718 South 17th Street.

### A.    Detention and Arrest

The record shows that the defendant was placed under surveillance and ultimately arrested based on information provided by a cooperating individual, Carlos Villalobos.  The reliability of the informant must be established before such information may be used as a basis for finding probable cause.  To this end, police officers may independently investigate the information obtained from a cooperating individual to establish its reliability. *See Illinois v. Gates*, 462 U.S. 213, 243-44 (1983); *United States v. Koons*, 300 F.3d 985, 991 (8th Cir. 2002); *United States v. LaMorie*, 100 F.3d 547, 553-54 (8th Cir. 1996) ("corroboration of the [CI's] information by independent investigation is an important factor in the calculus of probable cause.").

In this case, the record demonstrates that Villalobos participated in setting up a controlled transaction through his supplier, "V," which was to occur at the Kwik Shop.  The

-9-

transaction proceeded as planned, under police surveillance. The only inconsistency in the surveillance results was that Lang had described the defendant's vehicle as a black Nissan-type vehicle, while Langan and Heidzig said they saw a dark blue Honda arrive at the Kwik Shop. The officers' descriptions were consistent as to the physical appearance of the man driving the vehicle in question–a Hispanic male wearing a white ball cap and a black three-quarter length leather coat. From outside the Kwik Shop, Villalobos positively identified defendant as the person who earlier that day had delivered methamphetamine to Villalobos.

I find that the information obtained from Villalobos was sufficiently corroborated to provide probable cause for the defendant's arrest, and that the officers had probable cause to arrest the defendant for possession of illegal substances on the night of September 28, 2004.

**B.**     *Miranda*

The protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), "are triggered only when a defendant is both in custody and being interrogated. *United States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence*, 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied*, 516 U.S. 1150 (1996) (parallel citations omitted).

Gang Unit officers dispatched to the Kwik Shop immediately arrested the defendant and took him outside, where conversation occurred. Neither party has identified specific statements which they argue should or should not be suppressed. Apparently, the officers first asked the defendant his name and address. Routine biographical data is exempted from *Miranda*'s coverage. *See Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990); *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996).

Because there is no evidence that the defendant was given his *Miranda* rights at the scene of the arrest, I recommend that the motion to suppress statements be granted as to any statements which are not exempted from *Miranda*'s coverage and which were the result of "custodial interrogation."

To the extent the defendant's motion seeks the suppression of physical evidence based on a *Miranda* violation, the failure to give a suspect *Miranda* warnings does not require the suppression of the physical fruits of the suspect's unwarned but voluntary statements. *United States v. Patane*, 124 S. Ct. 2620 (2004). The record shows no indication of coercion or police misconduct in talking to the defendant at the time of his arrest. I find that all of defendant's statements were voluntary for purposes of applying *United States v. Patane*.

    **C.**    **Search of 1718 South 17th Street**

        *1.*    *"Standing"*

Defendant's motion and brief argue that defendant did not voluntarily consent to the search of the residence at 1718 South 17th Street; however, defendant testified that he did

not live at that address. Consequently, the issue of "standing" was peripherally mentioned at the end of the suppression hearing. Although counsel's position is unclear, it appears that the government has taken the position that the defendant did, in fact, reside at or have control over 1718 South 17th Street and the government does not intend to contest defendant's standing to challenge the search of the house.

### *2.     Coercion*

Defendant contends that he did not voluntarily consent to the search of 1718 South 17th Street. In this case, there are two aspects to the argument – (1) whether defendant did, in fact, consent and (2) whether the consent, if given, was voluntary.

The defendant's account of his arrest differs dramatically from that of the officers who testified at the suppression hearing. I give little weight to defendant's testimony that he did not understand the English language very well, or well enough to understand the arresting officers. Defendant testified that he had lived in the United States for 10 years, since he was 17 years old (53:23-54:1), and further admitted on cross-examination that he did understand what the officer was saying when the officer asked him for permission to search the house (53:4-9). He also admitted he understood the officers when they asked him which of his keys fit the house (see 54:17-19). Thus, according to the defendant himself, he understood the officers to have asked him for permission to search the house and which of his keys would open the house. He testified he told them he did not live at the house, did not know which key opened the house, and the house was left unlocked.

-12-

On the other hand, the surveillance officers had seen the defendant leave the 17th Street residence. According to Sergeant Langan, defendant said he lived at 1718 South 17th Street. When asked for consent to search the house, the defendant said he would consent and volunteered the information that the key to the house was on the ring with his car keys (38:5-14).[2]

I find Sergeant Langan's testimony to be more credible than that of the defendant and find that defendant did understand that he was being asked for permission to search the house and did, in fact, give the officers permission to search.

Turning to the issue of coercion, the following characteristics of persons giving consent are relevant when assessing the voluntariness of their consent: (1) their age; (2) their general intelligence and education; and (4) whether they consented after being informed of their right to withhold consent. In examining the environment in which consent was given, courts should ask whether the person who consented: (1) was detained and questioned for a long or short time; (2) was threatened, physically intimidated, or punished by the police;

---

[2] A consent to search is not an incriminating statement for purposes of *Miranda*. *See Cody v. Solem*, 755 F.2d 1323, 1330 (8th Cir.), *cert. denied*, 474 U.S. 833 (1985); *United States v. McClellan*, 165 F.3d 535, 544 (7th Cir.), *cert. denied*, 526 U.S. 1125 (1999); *United States v. Shlater*, 85 F.3d 1251 (7th Cir. 1996); *United States v. Henley*, 984 F.2d 1040, 1042 (9th Cir. 1993) (the mere act of consenting to a search does not incriminate a defendant, although the derivative evidence uncovered may be highly incriminating). Thus, *Miranda* warnings need not be given prior to requesting consent to search. *United States v. Newton*, 259 F.3d 964, 966-67 (8th Cir. 2001) (citing *United States v. Payne*, 119 F.3d 637, 643 (8th Cir.1997)).

(3) relied upon promises or misrepresentations made by the police; (4) was in custody or under arrest when the consent was given; (5) was in a public or a secluded place; or (6) either objected to the search or stood by silently while the search occurred. *United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990).

Sergeant Langan testified, credibly, that he did not threaten the defendant or promise anything, and the defendant did not appear under the influence of alcohol or drugs. While Langan was armed, his weapon was not drawn while he talked to the defendant. The arresting officers were wearing raid gear, i.e., bulletproof vests with "Omaha Police" printed on the front and back, cargo pants, and high, laced boots.

At the time consent was given, the defendant was under arrest and it does not appear that he was advised of his right to withhold consent to search. The conversation occurred in a public place. Defendant did not appear to be impaired in any way; had only been detained for a short time; was not promised anything; and had not been threatened, physically intimidated, or punished by the police.

Considering all these factors, I find that the defendant voluntarily consented to the search of 1718 South 17th Street.

## RECOMMENDATION

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS PHYSICAL EVIDENCE AND STATEMENTS (#12) be granted in part, and denied in part, as follows:

1.      The motion should be granted as to any statements which are not exempted[3] from *Miranda*'s coverage and which were the result of "custodial interrogation."

2.      The motion should be denied in all other respects.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" **on or before April 18, 2005**. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed de novo and a different disposition made.

**DATED April 4, 2005.**

                             **BY THE COURT:**

                             **s/ F.A. Gossett**
                             **United States Magistrate Judge**

---

[3] As discussed herein, the biographical information and consent to search obtained from the defendant are exempted from *Miranda*'s coverage.